UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| RITA KRUK,<br>   PLAINTIFF | : <br> :   Civil Action No. 302CV121 (AVC)<br>:<br>:|
| v. | :<br>:<br>:|
| PECHINEY PLASTIC PACKG. INC.,<br>METROPOLITAN LIFE INSURANCE<br>COMPANY,<br>   DEFENDANTS | :<br>:   December 3, 2004 |

**DEFENDANT METLIFE'S POST-TRIAL
MEMORANDUM OF FACT AND LAW**

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ............................................................................................................. 1

II.  STANDARD OF REVIEW ............................................................................................. 2

III. THE PLAN ....................................................................................................................... 4

IV.  THE EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS NOT
     ENTITLED TO LTD BENEFITS AND THAT METLIFE'S DECISION WAS
     REASONABLE ................................................................................................................ 5

  A. Overview of Plaintiff's Initial Claim for Benefits. ....................................................... 5

  B. MetLife's Determination that Plaintiff's Medical Records Do Not Support
     Total Disability Was Reasonable. ................................................................................. 6

     1. Plaintiff failed to establish the existence of a disabling psychiatric condition. ........... 6

     2. Plaintiff failed to establish the existence of a disabling medical condition. ................ 8

  C. MetLife Obtained Appropriate Medical Input from an Independent Physician
     Consultant. ................................................................................................................... 10

  D. MetLife Reasonably Determined that Plaintiff Did Not Qualify for LTD
     Benefits. ....................................................................................................................... 12

  E. Plaintiff Exercised Fully Her ERISA Appeal Rights. ................................................. 13

  F. MetLife Conducted a Full and Fair Review of Plaintiff's Appeal. ............................. 14

     1. Overview of the appeal process. ................................................................................. 14

     2. MetLife took the extra step of asking Dr. Witt for additional documentation. .......... 15

     3. The medical documentation produced and analyzed during the appeal did not
        establish the existence of a disabling condition under the Plan. ............................... 16

  G. MetLife Properly Denied Plaintiff's Appeal. .............................................................. 18

V.   METLIFE'S CLAIM PROCESS WAS FREE OF PROCEDURAL DEFECTS;
     ACCORDINGLY, THE EVIDENCE PROPERLY BEFORE THE COURT IS
     LIMITED TO THE CLAIM FILE AND SAL MARCHESE'S TESTIMONY ............... 19

    A.    Denise Paci's Testimony Validates the Completeness of MetLife's Claim File.......... 21

    B.    Neither the Testimony of Plaintiff Nor Her Husband Establish that MetLife's Claim File Was Incomplete. ............................................................................................... 24

    C.    Ann Wallace's Testimony Fails to Support the Allegation that the Claim File Was Incomplete. ................................................................................................................. 26

VI.    THE DECISION TO DENY LTD BENEFITS WAS REASONABLE AS A MATTER OF LAW AND IN NO WAY AMOUNTS TO AN ARBITRARY AND CAPRICIOUS DENIAL ....................................................................................... 26

    A.    Plaintiff Failed to Satisfy Her Burden of Showing Disability Under the Terms of the Plan. ..................................................................................................................... 27

    B.    MetLife's Decision Was Not Arbitrary and Capricious Because There was Ample Information in the Claim File Upon Which to Base its Denial. ..................... 28

    C.    MetLife Has the Discretion to Reject the Unsubstantiated Conclusions of Plaintiff's Treating Physicians. .................................................................................. 29

    D.    MetLife Legitimately Sought Objective Medical Information from Plaintiff. .............. 30

    E.    MetLife Was Not Required to Obtain an IME before Deciding Plaintiff's Claim....... 31

VII.    CONCLUSION.................................................................................................................. 32

I.     **INTRODUCTION**

This case concerns a dispute over the denial of plaintiff's claim for long term disability ("LTD") benefits under an employee welfare benefit plan ("the Plan") funded by plaintiff's employer, Pechiney Plastic Packaging Inc. ("Pechiney"), administered by Metropolitan Life Insurance Company ("MetLife"), and governed by the Employee Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 *et seq.* ("ERISA").

Plaintiff worked for Pechiney until her employment was terminated for performance reasons in July 2000. She filed a claim for LTD benefits in January 2001, claiming that she had been totally disabled since July 2000 due to depression, anemia and lupus. MetLife carefully analyzed all of the information provided by or on behalf of plaintiff. This information, however, failed to substantiate the existence of sufficiently severe restrictions or limitations on her functional abilities. To the contrary, the record demonstrated that plaintiff was capable of performing the major duties of her job notwithstanding her claimed ailments, which were in existence during her employment with Pechiney.

The underlying record amply supports MetLife's determination. In light of the strong record evidence supporting MetLife's determination, plaintiff's litigation strategy focused instead on a claim that the record was incomplete. As explained in more detail below, plaintiff's attempts to use Nurse Denise Paci, Pechiney employee "Billie" Wallace, suggestions of hypothetical faxes, her own testimony and that of her husband to create the suggestion of a flaw in MetLife's process are unavailing.[1]

---

[1] Tellingly, plaintiff did not even attempt to introduce testimony of Dr. Witt, or any other physicians, to support her apparent claim that MetLife failed to consider some crucial piece of evidence. The reason for this is, no doubt, because no such evidence exists.

1

In its post-trial memorandum, MetLife summarizes the ample record evidence demonstrating that plaintiff failed in meeting her burden to establish the existence of a disabling condition qualifying her for LTD benefits under the Plan. To the contrary, the medical information plaintiff submitted to MetLife reasonably supports MetLife's determination that plaintiff was capable of performing the major duties of her sedentary occupation. (*Infra* § IV.) In addition, plaintiff was afforded all of her ERISA appeal rights and MetLife's claims procedure was appropriate and fair. (*Infra* §§ IV(E-G), V.) Finally, this memorandum demonstrates that MetLife's claim determination easily surpasses the arbitrary and capricious standard of review and, indeed, was a reasonable decision arrived at through an appropriate claim process. (*Infra* §§ II, VI.) Plaintiff was unsuccessful, even after being provided ample opportunity to prove otherwise. Accordingly, judgment should enter in favor of MetLife and Pechiney on plaintiff's claim of wrongful denial of benefits in violation of ERISA.

## II.  STANDARD OF REVIEW

The Plan, which is funded by plaintiff's employer, Pechiney, expressly gives Pechiney (as Plan Administrator) the full, final and binding discretion to determine eligibility for benefits, construe and interpret Plan terms and designate others, such as claims administrators, to carry out Plan duties. This Court ruled that Pechiney designated MetLife, the claims administrator, to carry out the functions of interpreting the Plan language and making binding determinations as to eligibility for benefits. (*Ruling on Defendants' Motions for Summary Judgment, Sept. 30, 2003 at 32;* Plan, Defs' Ex. 12, pp. A1-3 – A1-5; Administrative Services Agreement, Defs' Ex. 3, p. 7.)

As the Court has already held, this case will be reviewed under the abuse of discretion standard. (*Ruling on Defendants' Motions for Summary Judgment, Sept. 30, 2003 at 31*). Where the plan confers upon the administrator discretionary authority to determine eligibility for benefits, a court shall not disturb the administrator's ultimate conclusion unless it is "arbitrary and capricious." Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 146 (2d Cir. 2003). "This deferential review applies to both plan interpretation and factual determinations." Snyder v. First Unum Life Ins. Co., 2004 U.S. Dist. LEXIS 16258 at * 9 (W.D.N.Y. Aug. 6, 2004).[2]

Under the abuse of discretion standard, the sole question before the court is whether the administrator's decision was reasonable. Pulvers v. First Unum Life Ins. Co., 210 F.3d 89, 92 (2d Cir. 2000). "The reviewing court need only assure that the administrator's decision falls somewhere on a continuum of reasonableness – even if on the low end." Scannell v. Metropolitan Life Ins. Co., 2003 U.S. Dist. LEXIS 20749 at * 19 (S.D.N.Y. Nov. 17, 2003) (internal citations omitted). See also Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999) ("the Administrator's decision need not be the only logical one nor even the best one . . . The decision will be upheld unless it is not grounded on any reasonable basis.")

The scope of review is narrow, and the court "is not free to substitute its own judgment for that of the plan administrator or claim administrator as if it were considering the issue of eligibility anew." Short v. Unum Life Ins. Co. of Am., 2003 U.S. Dist. LEXIS 22327 at * 19 (D. Conn. Dec. 3, 2003). The court "cannot re-weigh the evidence so long as substantial evidence supports the plan administrator's determination." Dunn v. Standard Ins. Co., 156 F. Supp. 2d

---

[2] Copies of cases reported in LEXIS are attached hereto as Exhibit 1.

3

227, 236 (D. Conn. 2001) "Substantial evidence" is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the decision maker [and] ... requires more than a scintilla but less than a preponderance." Id.

Under this standard, the Court must defer to the claims administrator where, as here, the claims administrator has shown there is a reasonable explanation for its claim determination. Sullivan v. LTV Aerospace & Defense Co., 82 F.3d 1251, 1255 (2d Cir. 1996). In fact, here, the claim determination was more than reasonable, it was correct.

### III. THE PLAN

Pechiney established and maintained the Plan to provide disability benefits to its employees participating in the Plan, including plaintiff. (Complaint, ¶¶ 9-11; Plan, Defs' Ex. 12, p. DI-4). Under the Plan, Pechiney funds LTD benefits for totally disabled participants, with coverage in an amount up to 70% of their pre-disability monthly pay. (Plan, Defs' Ex. 12, p. DI-6). The Plan provides totally disabled employees with benefits up to age 65 if the disability is due to physical injury or illness or 24 months if the disability is due to mental or emotional illness. (Plan, Defs' Ex. 12, p. DI-6).

The Plan defines total disability as:

> For the first two years of your long-term disability period, you are unable to perform the major duties of your job with Pechiney Plastic Packaging, Inc. After two years, you're totally and permanently disabled and unable to perform any job for which you are qualified by education, training and experience.

(Plan, Defs' Ex. 12, p. DI-6.)

The claimant must provide satisfactory medical evidence of his or her disability. (SPD, Defs' Ex. 11, pp. DI-7, DI-11; Plan, Defs' Ex. 12, p. DI-6.) Proof of the existence of a medical

4

condition – much less the mere reporting of subjective statements of symptoms – is not sufficient to prove total disability. (Marchese Testimony, 9/30/04, p. 65.) See also Brumer v. National Life of Vermont, 874 F. Supp. 60, 64 (E.D.N.Y. 1995), aff'd 133 F.3d 906 (2d Cir. 1998). According to the Plan, an individual is totally disabled if she has an injury or illness which causes her to be unable to perform the major duties of her job. Thus, plaintiff would qualify for benefits only if she could prove that she was unable to continue working in July 2000 because of an injury or illness. (Plan, Defs' Ex. 12, p. DI-6.) Snyder, 2004 U.S. Dist. LEXIS 16258 at * 11-12 (it is plaintiff's obligation to submit sufficient proof that he was disabled within the meaning of the Plan on the date he stopped working.)

## IV. THE EVIDENCE DEMONSTRATES THAT PLAINTIFF WAS NOT ENTITLED TO LTD BENEFITS AND THAT METLIFE'S DECISION WAS REASONABLE

### A.    Overview of Plaintiff's Initial Claim for Benefits.

On or about January 15, 2001, plaintiff submitted a claim for LTD benefits to MetLife. (Statement of Claim, Defs' Ex. 13.) To qualify for benefits under the Plan, plaintiff had to prove that she was totally disabled on the date she last worked. (Marchese Testimony, 9/30/04, p. 53.) According to the documents submitted to MetLife, plaintiff claimed she was unable to perform her job due primarily to depression, and secondarily to "Anemia Hematologic Disorder, Antinucelar Antibody-Positive Immunologic Disorder. Patient Subject to Abnormal Blood Clotting problems" and possible lupus. (Statement of Claim, Defs' Ex. 13; Diary Review Report, Defs' Ex. 17, 1/24/01, 10:59.) Accordingly, MetLife evaluated plaintiff's claim to determine if her claimed depression, anemia and/or lupus caused her to be unable to perform the major duties of her job. Because plaintiff's medical records indicated that plaintiff might

5

have had a cardiac condition, MetLife also considered whether this condition rendered plaintiff disabled under the terms of the Plan. (3/30/01 letter, Defs' Ex. 28.)

In order to be certain that it had received all of the information which plaintiff believed supported her claim, MetLife sent plaintiff two letters asking her to provide medical documentation, specifically requesting a list of medications that plaintiff was prescribed, copies of office notes, testing results, hospital admission and discharge summaries. (1/31/01 letter, Defs' Ex. 18; 2/26/01 letter, Defs' Ex. 19.) In response to these requests, MetLife obtained information regarding plaintiff's condition from her doctors: Leon Tec, Lawrence Kagen, David Witt and Gary Goldman. Doctors Kagen, Witt and Goldman provided medical records, while Dr. Tec, plaintiff's psychiatrist, provided an Attending Physician Statement and a Functional Assessment Report. (Kagen report, Ex. 21; Kagen records, Ex. 22; Witt records, Ex. 23; Goldman records, Ex. 24; Tec Attending Physician Statement, Ex. 16; Functional Assessment Report, Ex. 25.)

### B.  MetLife's Determination that Plaintiff's Medical Records Do Not Support Total Disability Was Reasonable.

#### 1.  *Plaintiff failed to establish the existence of a disabling psychiatric condition.*

The records submitted by plaintiff did not demonstrate that she was disabled within the meaning of the Plan. Dr. Tec, the psychiatrist identified by plaintiff as her attending physician, submitted only the Attending Physician Statement and the Supplemental Functional Assessment Form. (Defs' Exs. 13, 25.) Plaintiff chose not to provide MetLife with copies of the office notes maintained by Dr. Tec. (Claim File, Defs' Ex. 38; Marchese Testimony, 9/30/04, pp. 157-58.) In order to obtain additional information, MetLife supplemented Dr. Tec's reports by having a

Nurse Consultant conduct a telephone interview with Dr. Tec. (Diary Review Report, Defs' Ex. 17, 1/24/01, 12:56.)

Dr. Tec informed MetLife that plaintiff's primary diagnosis was depression and her secondary diagnosis was anemia/hematological disorder. (Attending Physician Statement, Defs' Ex. 13; Diary Review Report, Defs' Ex. 17, 1/24/01, 12:56.) Dr. Tec provided only a conclusory assertion that plaintiff was disabled, but his reports and statements to MetLife demonstrated that even though plaintiff may have experienced depression, it did not prevent her from performing the major duties of her job.

In fact, Dr. Tec's report showed that plaintiff had experienced chronic depression since 1995, yet she continued to work at Pechiney until her employment was terminated.[3] (Supplemental Functional Assessment report, Defs' Ex. 25.) Notably, Dr. Tec opined that a significant cause of plaintiff's stress was the loss of her job. (Diary Review Report, Defs' Ex. 17, 1/24/01, 12:56.) By stating that plaintiff's depression worsened only <u>after</u> her employment was terminated, Dr. Tec established that plaintiff's prior history of depression was not an illness that caused plaintiff to stop working. (Attending Physician Statement, Defs' Ex. 16; Supplemental Functional Assessment report, Defs' Ex. 25.) Under the terms of the Plan, disability benefits are payable only in the event that an injury or illness causes an individual to stop working. Dr. Tec's report demonstrated that plaintiff was not eligible for LTD benefits because her claimed depression did not prevent her from doing her job. (Plan, Defs' Ex. 12, p. DI-6; Marchese Testimony, 9/30/04, pp. 51-52.).

---

[3] Plaintiff has no basis to claim that some disabling condition arose simultaneous with her termination. First, there is no evidence in the administrative record. Second, while plaintiff testified that she was going to a doctor's appointment on the day she was fired (Plaintiff Testimony, 9/27/04, p. 131), there is no evidence that she was seeking treatment for some allegedly disabling condition.

7

MetLife also found that when asked to rate plaintiff's level of depression, Dr. Tec reported that her depression was only moderate. (Supplemental Functional Assessment report, Defs' Ex. 25.) Dr. Tec's moderate rating indicates that the impairment had some effect on plaintiff but did not preclude her ability to function. (Supplemental Functional Assessment report, Defs' Ex. 25.) Dr. Tec also determined that plaintiff's ability to perform a variety of tasks, such as supervising or managing others, comprehending and following instructions, and evaluating and making decisions without immediate supervision, was only moderately impaired by her the level of depression she experienced. (Supplemental Functional Assessment report, Defs' Ex. 25.) Further, it was Dr. Tec's opinion that plaintiff's ability to relate to other people beyond giving and receiving instructions was not impaired at all. (Supplemental Functional Assessment report, Defs' Ex. 25.) Additionally, Dr. Tec advised MetLife that his prognosis for the duration of plaintiff's condition was four to six weeks, minimum. (Diary Review Report, Defs' Ex. 17, 1/24/01, 12:56.) Based on the reports of plaintiff's own psychiatrist MetLife reasonably concluded that plaintiff was not totally disabled from her occupation within the meaning of the Plan.

      2.    *<u>Plaintiff failed to establish the existence of a disabling medical condition.</u>*

Nor did the other medical records demonstrate that plaintiff was disabled. In an attempt to establish her claims of anemia, lupus and blood clotting problems of disabling proportions, plaintiff produced to MetLife records from Dr. Kagen, Dr. Goldman and Dr. Witt. Contrary to what she wrote on her disability claim forms, the records produced by Dr. Kagen revealed that plaintiff did not clinically fit the diagnosis for lupus. Specifically, although some lab tests indicated a positive ANA in low titer, she never had any of the manifestations of lupus, such as

pleurisy, arthritis, skin rashes, alopecia, etc. (Kagen report, Ex. 21; Kagen records, Ex. 22). Similarly, with respect to her claims that she was anemic, the January 24, 2001 lab report produced by Dr. Kagen indicated that plaintiff's hemoglobin was within normal range, thus demonstrating the absence of any objective manifestation of anemia. (1/24/01 lab report, Defs' Ex. 49.)

Notably, Dr. Kagen indicated on the Physician's Disability Report, dated July 28, 2000, that although it was necessary for plaintiff to be absent from work for treatment, plaintiff was not unable to perform work of any kind and was not unable to perform one or more of the essential functions of her job. (Kagen report, Ex. 21.) Rather, Dr. Kagen's report shows that he concluded that plaintiff had the capacity to work intermittently or on a less than a full schedule. (Kagen report, Ex. 21.)

Similarly, Dr. Goldman's records established that plaintiff's history of anemia due to menorrhagia had existed for several years and had improved to almost normal following her hysterectomy in December 2000. (Goldman records, Ex. 24.) As shown in Dr. Goldman's January 18, 2001 letter, although plaintiff had been using iron tablets to correct her post-operative anemia, Dr. Goldberg concluded that "she is otherwise without any clear associated symptoms or signs" and her hematocrit level was "almost into normal range and [plaintiff could] decrease her iron therapy." (Goldman records, Ex. 24.) The records from Dr. Witt, plaintiff's internist, also confirmed that the physical symptoms reported by plaintiff, such as aches and fatigue, were the same symptoms that she had been living with for a long time and – despite their existence – she had been able to continue working. (Witt records, Ex. 23.)

Finally, MetLife considered the Attending Physician's Statement of Functional Capacity completed by Dr. Tec, which indicated that plaintiff had severe limitations in such skills as assuming cramped or unusual positions, climbing, balancing, bending, and operating small vehicles, heavy equipment and electrical equipment. MetLife analyzed these reported limitations in the context of the description of plaintiff's job responsibilities provided by Pechiney and concluded that these skills were completely unrelated to plaintiff's job. The primary physical task associated with plaintiff's job was sitting – a function for which plaintiff had no limitation. (Compare Attending Physician's Statement, Defs' Ex. 16 with Employer Statement, Defs' Ex. 14.)[4]

### C. MetLife Obtained Appropriate Medical Input from an Independent Physician Consultant.

After receiving the medical records, but without obtaining a report from MetLife's internal medical resources, such as a Nurse Consultant or an Independent Physician Consultant, the initial claims examiner, Linda Nelson, recommended approval of plaintiff's claim for benefits. Ms. Nelson, however, did not have authority for final approval of plaintiff's claim, and, in accordance with MetLife's standard procedures, the file was referred to her manager for further review. (Marchese Testimony, 9/30/04, pp. 72-76; Diary Review Report, Defs' Ex. 17, 3/26/01, 16:06 – 16:25.)[5] As part of the review process, the file was referred to a Nurse

---

[4] The weight MetLife attached to these reported physical limitations was further diminished by the fact that Dr. Tec, as a psychiatrist, was arguably not qualified to render opinions about plaintiff's purely physical capabilities.

[5] As Mr. Marchese testified, the entry on the Diary Review report that "user exceeded authority" is automatically generated by MetLife's computer claim system and indicates simply that the employee did not have authority to approve a claim at that level. (Marchese Testimony, 9/30/04, p. 73.) The authority of each claims examiner varies, depending on his or her level within the company and his or her years of experience. (Marchese Testimony, 9/30/04, p. 72.) The document titled "high liability case review" contained within the claim file is simply another aspect of the MetLife claim process: Ms. Nelson was not authorized to approve claims above a certain level, such as plaintiff's claim, and thus, MetLife procedure required that it be referred to her manager. (Pl's Ex. 7a; Marchese Testimony, 9/30/04, pp. 75-76.)

Consultant to assist in analyzing and interpreting the medical records. Having medical records reviewed by Nurse Consultants was a standard practice at MetLife. (Marchese Testimony, 9/30/04, pp. 7, 74-75; Diary Review Report, Defs' Ex. 17, 3/27/01, 10:45.) Plaintiff had no evidence to show that the review process which followed was in any way improper, biased or arbitrary and capricious.

The Nurse Consultant recommended an evaluation by an Independent Physician Consultant. (Diary Review Report, Defs' Ex. 17, 3/27/01, 10:45.) As part of its claim review process, MetLife frequently asks Independent Physician Consultants to review and interpret medical records and offer recommendations. (Marchese Testimony, 9/30/04, p. 8.) In particular, such record reviews are done when MetLife needs additional medical input to determine a claimant's functionality at the time she stopped working. (Marchese Testimony, 9/30/04, pp. 51-52.)[6] Because plaintiff would qualify for benefits only if it was determined that she was disabled from her occupation on the date she last worked (Plan, Ex. 12, p. DI-6; Marchese Testimony, 9/30/04, p. 53), a medical record review by an Independent Physician Consultant was appropriate. Accordingly, MetLife sent the claim file to Jeffrey Lieberman, M.D. (MetLife's IPC Referral Form, Defs' Ex. 26; Marchese Testimony, 9/30/04, p. 110.)

Dr. Lieberman, who is Board Certified in Internal Medicine and Rheumatology, reviewed all of plaintiff's medical records contained in the claim file. (Lieberman Report, Defs' Ex. 27.) Based on his review of the medical records, Dr. Lieberman concluded that plaintiff did not have any symptoms that would support a diagnosis of lupus. In particular, plaintiff never had

---

[6] Independent medical examinations, on the other hand, are done only when MetLife needs an assessment of the claimant's current functionality, such as when a claim has been in payment for a period of time. (Marchese Testimony, 9/30/04, p. 51.)

11

pleurisy, arthritis, skin rashes, alopecia or other manifestations of lupus. (Lieberman Report, Defs' Ex. 27.) Dr. Lieberman also concluded that although plaintiff provided some medical records which supported the existence of anemia, the records also demonstrated that plaintiff had symptoms of anemia for several years, but during that entire time she had continued to work full-time, and further, that the anemia had largely resolved following her hysterectomy. (Lieberman Report, Defs' Ex. 27.)

Finally, the medical records reviewed by Dr. Lieberman demonstrated that to the extent – if any – plaintiff suffered from depression, it did not prevent her from performing the duties of her job. (Lieberman report, Defs' Ex. 27.) Based on his independent medical analysis of all the information in the claim file, Dr. Lieberman concluded that there was nothing in any of the medical information supplied by plaintiff and her physicians that supported plaintiff's claim that she was unable to perform her job duties. (Lieberman Report, Defs' Ex. 27.) Again, plaintiff presented no evidence to prove, let alone suggest, any procedural impropriety or other deviation from the Plan by Dr. Lieberman.

### D. MetLife Reasonably Determined that Plaintiff Did Not Qualify for LTD Benefits.

After completing the claim evaluation process of reviewing plaintiff's Statement of Claim for Benefits (Defs' Ex. 13), the Employer Statement (Defs' Ex. 14), all of the medical documentation submitted by or on behalf of plaintiff (Defs' Exs. 16, 21-25), and the report of the Independent Physician Consultant (Lieberman Report, Defs' Ex. 27), as well as interviewing plaintiff and Dr. Tec (the doctor whom she identified as her attending physician) (Diary Review Report, Ex. 17; 1/24/01, 10:59; 1/24/01, 12:56), MetLife reasonably concluded that, based on the

totality of information, plaintiff was not totally disabled as defined by the Plan because plaintiff's medical conditions did not prevent her from performing the major duties of her job.

As the next step in the process, MetLife notified plaintiff that her claim for LTD benefits was denied by letter dated March 30, 2001. (3/30/01 letter, Defs' Ex. 28.) In this letter, MetLife recounted in detail the records it had reviewed and described its reasons for determining that plaintiff had failed to establish that she was entitled to LTD benefits. (3/30/01 letter, Defs' Ex. 28.) MetLife's letter clearly notified plaintiff of her failure to provide certain pertinent medical information, such as office notes and copies of any testing information from her psychiatrist. (3/30/01 letter, Defs' Ex. 28.) MetLife also advised plaintiff that she could file a request for a review of the claim and that if she chose to do so, she should include any important new facts or medical information bearing upon her benefits claim. (3/30/01 letter, Defs' Ex. 28.)

### E.     Plaintiff Exercised Fully Her ERISA Appeal Rights.

Some two months later, in May 2001, plaintiff requested an appeal of the denial of her claim and submitted letters from Dr. Witt and Dr. Tec to support her appeal. (5/29/01 request for appeal, Defs' Ex. 30.) By requesting the appeal, plaintiff confirmed that she was fully aware of her rights under ERISA. See Kaus-Rogers v. Unum Life Ins. Co. of Am., 2004 U.S. Dist. LEXIS 9797 at * 11 (W.D.N.Y. April 14, 2004) (the fact that plaintiff sought review of defendant's denial of her claim by submitting additional medical records demonstrates that the denial letter provided adequate notice). Moreover, by offering the letters of Dr. Tec and Dr. Witt, plaintiff demonstrated that she was aware that it was her obligation to supplement her claim with additional medical records. Id.

The additional letters did not support the existence of a compensable disability claim. Instead, the letter from Dr. Tec, dated May 24, 2001, briefly stated nothing more than a conclusory opinion that plaintiff suffered from severe depression which prevented her from working. Dr. Tec did not provide any objective medical findings or other evidence supporting this assertion, but relied instead only on plaintiff's own subjective complaints regarding the purported nature and severity of her condition. (5/24/01 letter, Defs' Ex. 31.)

Plaintiff also presented a brief letter from Dr. Witt, dated May 6, 2001, in which he reported that plaintiff experienced joint pains, rashes, fever, anemia and fatigue, as well as positive ANA tests and stated in a conclusory fashion that plaintiff was unable to function effectively at work due to the symptoms of "mixed connective tissue disease" without any explanation of what "mixed connective tissue disease" was or how it prevented plaintiff from performing her job as Human Resources Director at Pechiney. Dr. Witt did not provide any test results, or medical records to support his statements. (5/6/01 letter, Defs' Ex. 30.)[7]

### F.  MetLife Conducted a Full and Fair Review of Plaintiff's Appeal.

#### 1.  *Overview of the appeal process.*

Pursuant to its standard appeal process, plaintiff's appeal letter and the letters from Dr. Tec and Dr. Witt were reviewed by the claim unit that originally considered her claim to determine if the information provided caused it to reverse its denial. After the claim unit decided that reversal was not warranted, the entire claim file, including the new information, was forwarded to the appeal unit, which was charged with reviewing all of the information anew and making its own determination regarding plaintiff's eligibility for LTD benefits. (Marchese

---

[7] This was the first time in the entire history of the claims process any of plaintiff's doctors reported that plaintiff had this condition.

14

Testimony, 9/30/04, pp. 41-42.) Specifically, Salvatore Marchese took over the appeal process. In his evaluation of the claim, Mr. Marchese reviewed the entire claim file and, ultimately, as described in more detail below and testified to at trial, determined that the denial of benefits was appropriate. (Marchese Testimony, 9/30/04, pp. 35-36, 48-49, 78.)

    2.    <u>*MetLife took the extra step of asking Dr. Witt for additional documentation.*</u>

As with all stages of the claim, it is the claimant's responsibility during the appeal process to provide MetLife with all documentation she believes supports her claim. (3/30/01 letter, Defs' Ex. 28.) MetLife does not typically request additional medical documentation from the claimant or her providers during the appeal process because the purpose of the appeal is to determine whether the correct determination was made based on the record before the claims unit. Instead, its standard practice is to evaluate whatever documentation the claimant chooses to provide in response to the denial letter. (Marchese Testimony, 9/30/04, p. 44.)

MetLife's claims unit, a Nurse Consultant, and Mr. Marchese each independently analyzed the letters from Dr. Tec and Dr. Witt and concluded that the cursory information failed to justify a reversal of the denial of plaintiff's claim. (Diary Review Report, Defs' Ex. 17, 6/25/01, 17:02 – 7/2/01, 15:17; Marchese Testimony, 9/30/04, pp. 48, 169.) MetLife was not required to seek additional medical information to render a decision on appeal and could have simply denied the appeal at that time. <u>Cosme v. Ameritech C777, Inc.</u>, 2004 U.S. Dist. LEXIS 8086 at * 10-12 (N.D. Ill. May 5, 2004) (if there is sufficient evidence in the administrative record to make a reasonable decision to deny benefits, the administrator has no obligation to inquire further.) MetLife, however, took the extra step of asking for additional information from